## THE CONGREGATIONAL SOCIETY IN LANESBOROUGH *versus* ALMON CURTIS.

In 1741 the legislature granted to individuals a township of land, to be laid out in a certain number of shares, one of which was to be for the ministry. In 1764 the grantees settled their first minister, who was of the congregational order, and who entered upon the ministerial land and occupied it until 1797. In 1796, there being also an unincorporated protestant episcopal society in the town, besides some individuals who were baptists, and the congregational society having never organized themselves as a parish, the town, up to that time and for many years after, possessing and exercising all the capacities and functions both of a town and a parish, it was voted at a town meeting, that the town would petition the legislature that the land might be sold and the proceeds be kept as a fund, and the income divided in certain proportions between the congregational and episcopal societies; and in 1797 the legislature passed a resolve authorizing the sale and distribution and providing for the appointment of trustees, but with a proviso that it should be in the power of the legislature, on the application of any denomination of Christians having a settled minister in the town, thereafter to make a new appropriation of the income. The land was sold, the proceeds placed in the hands of a trustee, and the income applied, agreeably to the resolve. In 1814, upon an application made without any authority from the town, by the ministers of the congregational and episcopal societies and the selectmen of the town, the legislature, without issuing any order of notice to all persons interested, passed a resolve repealing the proviso above mentioned and confirming the appropriation of the income as then already established. The baptists formed a society before the repeal of the proviso and employed ministers to preach a part of the time. The present baptist church was organized and constituted in 1818, and employed ministers to preach a part of the time until 1834, when they had a settled minister to preach the whole time. The episcopal society was incorporated in 1823, and in 1824 the congregational society organized themselves as the first parish. In 1837 the legislature, upon the application of the baptist society, and after due notice, passed a resolve that a portion of the income should be paid to that society. It was *held,* that the act of the town and the congregational minister in the sale of the land and disposition of the proceeds and income, and the acquiescence of all persons either legally or beneficially interested in the property, for a period of nearly fifty years, was conclusive evidence of their assent to the resolve of 1797, and of course to the proviso, and that with such assent the resolve was valid and the power in the proviso well reserved to the legislature ; that the repeal of the proviso, under the circumstances, was neither a renunciation nor a final execution of the power reserved to the legislature, and did not preclude them from exercising the power reserved ; and that the resolve of 1837 was valid.

ON a case stated it appeared, that on the 13th of January, 1741, the legislature granted to seventy-six petitioners a township, to be laid out in seventy-nine lots, one of which was to be for the first settled minister, one for the ministry, and one for the school, on certain conditions, which were afterwards performed. The proprietors laid out the township accordingly, built a meetinghouse, and in 1764 settled and ordained the Rev. Daniel Collins, who was of the congregational order, as their first minister. He entered upon the share appropriated for the ministry, and occupied it until the 18th of May, 1797, when it was sold in virtue of a resolve of the legislature of the 15th of February, 1797. The town was incorporated in 1765, by the name of Lanesborough.

At a town meeting in May, 1796, a vote was passed, all denominations of Christians that were present voting, that the town would petition the legislature that the ministry land might be sold and the proceeds be kept as a fund for the benefit of the congregational society and the protestant episcopal society in the town, the congregational to have four fifths and the episcopal, one fifth of the income, for the support of their severai ministers and their successors forever ; and that G. Wheeler and W. Hubbell, (both members of the congregational society,) should be a committee to present the petition. This committee accordingly presented a petition to the legislature in May, 1796, which was continued to the next session, to be held in February, 1797. At a town meeting held in September following, for the purpose of ascertaining whether the town would not reconsider the preceding vote, a committee was appointed, consisting of three congregationalists, three episcopalians and three baptists, who, at a town meeting held in November following, reported, that Mr. Collins should receive out of the income of the money arising from the sale of the land, $ 66·67 annually, during his ministry, in addition to his salary, as a compensation for relinquishing the land, and that the same sum should remain to his successors of the congregational order forever ; and that of the remainder of the income, Mr. Collins and his successors should have two thirds, and the Rev. Daniel Burhans, minister of the protestant episcopal church,

Congr. Soc.
in Lanes-
borough
v.
Curtis.

and his successors, should have the other third. A vote was passed in conformity to this report.

On the 15th of February, 1797, the legislature passed a resolve, authorizing Mr. Collins and the selectmen of the town, to sell the land and put the proceeds of the sale on interest, the income to be applied, under the directions of such persons as the inhabitants of the town might from time to time appoint for that purpose, in the manner contained in the vote last mentioned ; with a proviso, that it should be in the power of the legislature, on the application of any denomination of Christians having a settled minister in the town, thereafter to make a new appropriation of the income.

Pursuant to this resolve the land was sold in March, 1797 ; and notes were taken payable to the selectmen and their successors, and the income of the fund was applied, agreeably to the resolve, up to January, 1824. In November, 1797, the treasurer of the town was appointed trustee of the fund, and the notes were delivered into his hands, to be renewed as they should become due. After this period the notes were taken, some in the name of the inhabitants of the town, and some in the name of the treasurer and his successors.

On the 8th of June, 1814, upon an application made without any authority from the town, by Mr. Collins, minister of the congregational society, Mr. Purdee, minister of the episcopal church, and the selectmen, consisting of two congregationalists and one episcopalian, the legislature, without issuing any order of notice to all persons interested, passed a resolve repealing the proviso before mentioned, and confirming the appropriation of the fund and income as then already established.

The episcopal church was organized in 1767, and on the 3d of February, 1823; it was incorporated by the legislature. In December, 1824, the inhabitants of the town belonging to the congregational society organized themselves as a parish. These societies made use of the corporate capacity of the town, and of the town officers, to raise and collect money for the salary of their ministers, and for repairing their meetinghouses, before 1797 occasionally, and uniformly afterwards until 1819, when the episcopal society raised money by themselves for these purposes.

In 1824, S. Whitney, who was the treasurer of the town, and had in his hands the notes constituting the ministry fund, was chosen treasurer of the congregational parish, and appointed trustee of the fund, and was directed to retain it in his hands for the use of the parish. A demand was made, on the part of the episcopal society, for their portion under the resolve of 1797, and a suit was brought to recover it, viz. *Humphrey* v. *Whitney*, 3 Pick. 158, which suit was decided in favor of the episcopal society ; and the income has been since divided between the two societies, according to the resolve, until 1838.

<div style="float:right">Congr. Soc.<br>in Lanes-<br>borough<br>v.<br>Curtis</div>

In 1796, when the two votes were passed for obtaining leave to sell the ministry land, a majority of the voters in the town were of the congregational denomination. There was then no baptist society in the town, and but a few persons of that persuasion. Their numbers have since increased, and the baptist society is now as large as either of the two other societies. In 1806 the baptists hired Elder Covel to preach one fourth part of the time ; and between that time and 1821 there was occasional preaching by different elders. For two years between 1806 and 1812, Elder Francis preached regularly one fourth of the time. In 1812, the society had a committee, who gave certificates of membership to twenty inhabitants of Lanesborough. In 1821, the society being then a regularly organized society, having a constitution for the due regulation of the society, with a clerk and committee exercising all the duties of such officers, the Rev. A. Beach, a regularly ordained baptist elder or minister, was settled to preach to the society one half of the time ; which he continued to do for six years. Afterwards the society had preaching the greater part of the time until 1831, when the Rev. W. G. Johnson was employed to preach one half of the time, until 1834 ; after which he preached for them the whole time, being regularly ordained and settled, until within about two years ; since which time the Rev. J. V. Ambler, being regularly ordained and settled, has preached the whole time. In 1828 the society erected their present house of public worship. The present baptist church was constituted and organized on the 30th of May, 1818.

In January, 1823, a petition of the members of the baptist

Congr. Soc.
in Lanes-
borough
*v.*
Curtis.

society was presented to the legislature, praying for a division of the income of the fund above mentioned, so as to give them their proper share according to the terms of the resolve of 1797 ; and on the 15th of the same month, at a town meeting of the inhabitants of Lanesborough, it was voted, that the income be divided equally between the congregational, episcopal and baptist societies, according to their taxable estates in the town, to be ascertained by the assessors thereof ; and that the treasurer of the fund be directed to pay over to the three societies the equal proportions of the income according to the taxable estate in the town, commencing on the 1st of January, 1824, provided the legislature grant the prayer of the petition of the baptist society ; and that the town clerk be directed to transmit to the legislature a copy of the proceedings of the town meeting. A copy was accordingly transmitted, but the prayer of the petition was not granted by the legislature.

In 1835 the members of the baptist society presented a similar petition to the legislature, and also in 1836, in both of which years the congregational society remonstrated against it, and no definitive action was had thereon in either of those years. In 1837 the same petition was again brought before the legislature, and after due notice to all parties interested and a full hearing, the congregational society having again presented their remonstrance, the following resolve was passed, bearing date the 29th of March, 1837 : — " Resolved, for the reasons set forth in said petition, that after the first day of April, 1837, the income of one half of the two thirds of the ministerial fund now received by the congregational society of the town of Lanesborough, shall be paid by the trustees of said fund to the baptist society in said Lanesborough, in like manner and at such times as said income has heretofore been paid to the congregational and episcopal societies ; provided that if any other religious society shall arise in said town, the legislature may, on petition of the said society, authorize such proportional part of the income of said funds to be paid to said new society, as they may think proper, whenever said society shall support a stated ministry."

At a town meeting on the 23d of December, 1837, it was voted that the selectmen be directed to place the ministry fund

in the legal keeping of some responsible man ; and the select- Congr. Soc.
men thereupon placed it in the hands of the town treasurer, the in Lanes borough
defendant in this action, and instructed him to pay out the in- *v.*
terest according to the provisions of the resolve of 1837 ; Curtis.
with which instructions he complied.

The plaintiffs made a demand on the defendant to pay over
to them the two thirds of the income for the year 1837, and
upon his refusal this action was brought to recover the same.

If the Court should be of opinion, that in any form of action
the plaintiffs were entitled to recover, the defendant was to be
defaulted ; otherwise the plaintiffs were to become nonsuit.

The case was argued in writing.

*H. Hubbard,* for the plaintiffs. At the time of the grants
by the legislature, of ministry lands to towns, the congregation-
al ministers were the only town ministers. They were sole
corporations, and by intendment of law, the fee simple of the
lands was vested in them and their successors, in right of their
respective towns. And contemporaneous law applicable to
grants must govern such grants.

By the common law, such minister, with the assent of the
town, could alien the parsonage, as was declared by the Prov-
ince law, Anc. Charters, &c. *c.* 259.

The constitution, by ordaining that towns should make suit-
able provision for and maintain public teachers of piety, reli-
gion and morality, made towns the founders of the ministry,
and ratified and confirmed the original grants to them ; and *St.*
1785, *c.* 51, revising the Province law, declared the ministry
land to be alienable in fee by the parson, with the consent of
the town. The 11th amendment of the constitution, although
it has absolved towns from the duty of supporting a minister,
has not impaired or altered the title and destination of ministry
lands or funds, that is, has not made them partible and granta-
ble by the legislature.

From this view of the law and the constitution it is apparent,
that the application of the congregational minister and the town
of Lanesborough in 1796, was entirely unnecessary, since they
had power to alien the land and apply the proceeds as they
pleased ; for the town was obliged and able to provide for a
town minister. But if the division of the ministry fund as

specifically proposed, required the aid of the legislature to carry it into effect, that would not render the subject matter partible and distributable by the legislature, among objects not agreed on or appointed by the *cestui que use* and the town. Nor could that application vest in the legislature any estate or interest, for it was not a grant or surrender. The legislature, therefore, having no interest to grant, did not grant any, and consequently, having no right to appoint future distributees and settle portions upon them, the proviso in the resolve of 1797 was necessarily void, unless it be construed as only a declaration of all the parties to the proceeding, that they reserve the right to admit other beneficiaries to a participation in the fund, or a readiness of the legislature, on a similar specific voluntary arrangement and application of the *cestui que use* and the town, to coöperate as it did in this resolve.

If, however, the proviso is construed as an assumption by the legislature, of a power of disposition, or of altering the disposition made by the parties, then it was absolutely void, because it was superrogatory, intermeddling where the purpose of the original grant was fulfilled ; because it was a usurpation ; because it enforced the requisition to support a town minister, while it diminished the means ; and because it vainly attempted to change by a resolve, an inheritance at law, which can be done only by a statute.

But whatever may be the true construction of the proviso, it was repealed by the resolve of 1814. An individual reserving a power to himself may renounce it, and much more may the legislature do so, unless restrained by special contract or trust ; and there was none here. As to notice, the parties in interest, the same that applied for the resolve of 1797 and executed it, applied in 1814 for the repeal of the proviso. At any rate the town took notice and gave their consent to the repeal, their subsequent acquiescence implying consent at the time or afterwards. Notice could not be given to the baptist society, for it was not organized until 1818.

But if the proviso is still subsisting, the resolve of 1837 is not in execution of it, but at variance with it. And whether this resolve comports with it or not, the resolve itself is void

for repugnance to the common and statute law, and to the constitutions of this State and the United States.

*Wells* and *Alvord*, on the same side, did not contest the validity of the resolve of 1797, but argued that the resolve of 1814 was effectual to take from the legislature the power reserved in the proviso of 1797. The principal objection to the resolve of 1814 is, the want of notice and consent. So far as concerns the baptist society, the answer is, that in 1814 it had not, and without further action of the legislature could not have, any title or interest whatever in or to the fund. It is true, a grant to a corporation not *in esse*, for pious uses, cannot be resumed by the donor; *Shapleigh* v. *Pilsbury*, 1 Greenleaf, 291 ; *Pawlet* v. *Clark*, 9 Cranch, 292 ; but the distinction is between a grant, and a mere power to grant, at the will of another who may exercise it or not, at his pleasure. The former is never revocable ; the latter, when reserved by the donor, (as in this case,) is always revocable, at his will. If the baptist society had been in existence in 1814, it could have made no difference. The resolve would have been valid without its consent or against its remonstrance, with or without notice, for until the actual exercise of the power reserved to the legislature, the society had no property or interest in the fund, to be represented or affected in any proceeding in relation to it. *Albany's Case*, 1 Coke, 111 ; *Digges's Case*, 1 Coke, 175 ; *Leigh* v. *Winter*, W. Jones, 411 ; *Bird* v. *Christopher*, Styles, 389 ; *Edwards* v. *Slater*, Hardres, 410 ; *King* v. *Melling*, 1 Ventr. 225 ; *Tomlinson* v. *Dighton*, 1 P. Wms 149 ; Sugden on Powers, 65, 66, 81 ; 2 Chance on Powers, 586, 590 ; *West* v. *Berney*, 1 Russell & Mylne, 431 ; *Cunnynghame* v. *Thurlow*, ibid. 437, note ; *Smith* v. *Death*, 5 Madd. Ch. R. 371. It may be said that the consent of the congregational and episcopal societies was necessary to the repeal, in order to give it validity in their favor. But the baptist society cannot take advantage of this objection ; *Wellington, Petitioner*, 16 Pick. 87 ; and besides, the consent of those societies is in law presumed, it being for their benefit to have the proviso repealed. 1 Mathews on Presumptive Evidence, 35, and cases there cited ; *Townson* v. *Tickell*, 3 Barn. & Ald. 31 ; *Brooks* v. *Marbury*, 11 Wheaton, 96 ;

Congr. Soc. in Lanesborough
*v.*
Curtis.

*Halsey* v. *Whitney,* 4 Mason, 214. Further, after the lapse of twenty years, especially with the fact that the selectmen of the town and the ministers of the congregational and episcopal societies were the applicants for the repeal, notice to all persons interested and their consent, will be presumed. *Brown* v. *Wood,* 17 Mass. R. 72 ; *Ellis* v. *Marshall,* 2 Mass. R. 268.

*Briggs* and *Rockwell,* for the defendant.

SHAW C. J. drew up the opinion of the Court. In deciding this case, we think it will not be necessary to revert to all the points raised in the very full and elaborate arguments which have been submitted to us.

It is an action brought by the congregational society in Lanesborough, to recover two thirds of the income of a ministerial fund described in the statement of facts. The defendant, the trustee of that fund, has paid one half of the controverted sum to the plaintiffs, and the other to the baptist society in the same town, for the support of the ministry in that town. This he justifies under a resolve of the legislature passed in 1837, directing the income of the fund so to be distributed ; and the question is, whether that resolve is legal and valid and constitutes a good ground of this justification. Its validity is contested and denied on the ground, that the plaintiffs had a legal and vested right to the income of two thirds of this fund, and that it was not within the legitimate authority of the legislature to alter this appropriation, and give any part thereof to the baptist society, as they have attempted to do, and in form have done, by the resolve in question.

The land, from the sale of which this fund was raised, was originally granted by the Provincial legislature to the inhabitants of the town then, and for many years after, possessing and exercising all the capacities and functions both of a town and a parish. This was the state of that town in 1797, when they passed votes, providing with the consent of the minister, for the sale of the lands, under the authority of a resolve of the legislature. By that resolve, it was directed that the proceeds of the sale should be held as a fund, and the income paid over in certain proportions, to the congregational and episcopal societies, and with a further proviso, that it should be afterwards in

the power of the legislature, on the application of any denomination of Christians having a settled minister in the town, to make a new appropriation of the income.

In pursuance of this resolve, the town and the minister joined in the sale of the lands, and took securities, which have ever since constituted the fund in question.

This act of the town and of the minister, with the acquiescence of all persons interested for a period of nearly fifty years, is conclusive evidence of their assent to this resolve, and of course to all its provisions and conditions.

Had the town refused or declined to act upon this subject, and the lands had remained unsold, until other organized and incorporated parishes had been created within the same town, there is no doubt that the lands would have remained vested in the residue of the inhabitants, who would *de facto* have become the first parish, and would have succeeded to all the rights of the town held by it in its parochial character, before such division. But, at that time, although there was an episcopal society, it existed only as a voluntary association, and was not recognized as a parish. The town therefore was still acting both in a municipal and a parochial capacity, and its assent to the resolve in question, must be deemed to be the assent both of the town, and the present plaintiffs, constituting by subsequent organization the first parish. The resolve was passed with the assent of all those who were either legally or beneficially interested in the property.

Such a legislative act has been held to be valid, in a former suit, in relation to this same ministerial fund. " With the consent of the parties legally and equitably interested in the grant, a legislative act will avail to enable those parties to carry into effect just and honest intentions in relation to the property, preserving the original purpose and object of the grant." *Humphrey* v. *Whitney*, 3 Pick. 164.

The original object of the grant was the support of the ministry, for the benefit of all the inhabitants, not for the benefit of any particular denomination of Christians. Had the congregationalists formed a separate society, and become incorporated, and the residue of the town been baptists, supposing the and had remained vested in the town up to the time of the

Congr. Soc. in Lanesborough
*v.*
Curtis

incorporation of such separate congregational society, the baptists would have composed the first parish, and held the land as successors. An appropriation therefore of the fund to the support of the ministry of several denominations, all being inhabitants of the town, is in no sense incompatible with the original purposes of the grant. We consider it therefore as already judicially settled, that the resolve, authorizing the sale of the land, and the distribution of the income in certain proportions between the congregationalists and the episcopalians, was valid.

But then it is contended, that the proviso, reserving to the legislature the power of altering this distribution, in favor of any other denomination of Christians who should have a settled minister, was void, because the legislature then made no grant, out of which such a power could be reserved, and because the minister and town might have made the same disposition of the property, without the aid of the power of the legislature.

In the first place, we have seen that this resolve, including the proviso and reservation of power, was assented to and acted on by all parties in interest. The reservation of power to provide out of the fund for other denominations of Christians in the same town, was as much within the object and purpose of the original grant as the provisional and temporary distribution then made.

But it does not and cannot appear that the inhabitants of the town, who may have consisted of persons of several Christian denominations, would have consented to join with the incumbent in the ministry, to alienate these lands, without the authority of the legislature, and that granted on condition that such power should be reserved. Nor can it appear that the legislature would have granted the power to alienate the lands without such reservation.

By applying to the legislature for such power, the parties admitted their desire at least, if not their need, of such a power, to carry their real objects into effect. As they intended to provide not only for societies then in being, but for denominations of Christians who were not then in being as organized bodies, capable of granting, taking and acting, by deed or contract, the only mode in which it could be accomplished was, to

ask the legislature to give its sanction to such an equitable ar-
rangement. We think therefore that the plaintiffs, who claim
directly as successors of the town, must be considered as legal-
ly and equitably bound by the assent of the town, and with
such assent, the power was well reserved, and might be exe-
cuted by the legislature upon the happening of the contingen-
cy, upon which it was to be exercised. Such a power is not
to be construed with the technical precision of a power reserv-
ed by an individual upon a grant of lands. The reservation
was substantially in favor of other denominations of Christians,
some of whom existed individually, but not as organized socie-
ties ; all those actually or potentially interested, asked the inter-
position of the legislature, upon a condition ; the legislature
granted it upon that condition, it was accepted and acted upon,
with that condition and reservation, and therefore the reserva-
tion was valid, and conferred on the legislature the power which
it purported to reserve.

The next question is, whether the repeal of this proviso, un-
der the circumstances stated in the case, was either a renun-
ciation of the power reserved by the resolve of 1797, in favor
of other denominations of Christians, or a final and complete
execution of that power, so that the resolve of 1837, in favor
of the baptists, was void.

It appears by the facts agreed, that in 1814, upon applica-
tion made without any authority from the town, by the several
ministers of the congregational and episcopal churches, and the
selectmen, two of whom were congregationalists and one an
episcopalian, the legislature, without an order of notice, passed
a resolve repealing the above proviso, and making the former
provisional distribution and appropriation absolute and perpet-
ual. The Court are of opinion, that this act of the legislature,
passed without the authority of the parties either legally or ben-
eficially interested, and upon the unauthorized request of those
who were adversely interested, and this without notice to those
who were interested, was neither a renunciation, nor a final ex-
ecution of the power reserved to them, and did not preclude
their successors from exercising the power originally reserved.

Whether this power reserved as a perpetual benefit in favor
of denominations of Christians who should afterwards spring

up in that town, could be renounced by one legislature so as to bind their successors, if done after notice to all parties then existing ; or whether the Court would be bound to presume that an act done by the legislature, was done after due notice, are questions of difficulty, on which we give no opinion.    It is found as a matter of fact, and was so in the case of *Humphrey* v. *Whitney*, that this resolve was not passed under these circumstances, and therefore this act did not deprive the legislature afterwards of the power reserved to them in the prior resolve, of making a new distribution of this fund in favor of the baptist society, which afterwards grew up and became regularly organized and had a settled minister.

The Court are therefore of opinion, that the resolve of 1837 was within the authority of the legislature and valid, that it was a good authority to the defendant as trustee of the fund, to pay over the proportion of the income to the baptist society for the support of their ministry as he has done, and that the plaintiffs are not entitled to recover.

*Plaintiffs nonsuit.*